**Werner H. ERHARD, Petitioner–Appellant,**

v.

**COMMISSIONER INTERNAL REVENUE SERVICE, Respondent–Appellee (Three Cases).**

**Nos. 93–70357, 93–70359 and 93–70360.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 17, 1994.

Decided Feb. 8, 1995.

---

**18.** Phillip Hamburger, *The Great Judge*, Life, Nov. 4, 1946, at 119, 122–23 (quoting Judge Learned Hand).

Michael I. Saltzman, Baker & McKenzie, New York City, for petitioner-appellant.

William J. Patton, Tax Div., U.S. Dept. of Justice, Washington, DC, for respondent-appellee.

Before: LAY,* PREGERSON, and O'SCANNLAIN, Circuit Judges.

---

* The Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

1. The ownership of est, a.e.c. was so complex that when Erhard decided to alter the organiza-

O'SCANNLAIN, Circuit Judge:

We are invited to follow the winding paths of circular money movements to determine whether they lead to transactions of economic substance for federal income tax purposes.

## I

Werner Erhard has offered a variety of seminars, workshops, and other programs in personal effectiveness since 1971. At that time, Erhard hired tax attorney Harry Margolis to be his personal financial and legal advisor. Margolis arranged the formation and financing of Erhard Seminars Training, Inc.

In 1975, Margolis created a new corporation, "est, a.e.c.," to assume the activities of Erhard Seminars Training, Inc. The stock of est, a.e.c. was seemingly owned by a complex web of offshore entities created by Margolis.[1] Erhard purported to be just an employee of est, a.e.c., without any legal ownership interest.

Integral to both est, a.e.c. and its predecessor, Erhard Seminars Training, Inc., was the Harry Margolis "system." The system was composed of offshore and domestic corporations, trusts, banks, partnerships, and other entities that were used to implement Margolis' tax planning. Such so-called "system entities" were controlled either directly or indirectly by Margolis. The est, a.e.c. organizational structure devised by Margolis was a maze of intertwined organizations with numerous agreements among the entities involved. After Margolis created est, a.e.c., he created a variety of system entities which dealt only with est, a.e.c. As Erhard's counsel explained, the main purpose of such an organization was "to try to get money paid offshore in a deductible fashion, and then the money would find its way onshore in a nonincome fashion." Reporter's Transcript, volume 22 at 102.

In implementing this tax planning, Margolis devised orchestrated money movements

tional structure in 1981, it apparently took his legal and financial advisors months to sort through the complicated legal and financial structures that Margolis had used in his planning.

that were structured by contractual arrangements. In a typical circular money movement, funds would pass from one system entity to a taxpayer, and then from the taxpayer to a second system entity for some ostensible business purpose of the taxpayer. Thus, the taxpayer would appear to have incurred a substantial expenditure, whereas he in reality had merely taken money from, and then returned it to, the system. Consequently, Margolis' transactions have been described as "financial gymnastics, devoid of economic substance." *Goldberg v. United States,* 789 F.2d 1341, 1343–44 (9th Cir.1986).

Margolis maintained so-called "system accounting" for his clients which consisted of a chronological list of the client's transactions within the system and which kept track of the client's balance, either positive or negative, vis a vis the system. All funds that went into the system from a client or a nonsystem entity were entered as a credit to the client while all funds that went out of the system to a client or a nonsystem entity were entered as a debit to the client. A client earned interest on positive balances in the system accounting and was charged interest on negative balances. Transactions between system entities were not recorded because the funds stayed in the system. Though Erhard purportedly had no ownership interest in est, a.e.c., Margolis maintained only one combined system accounting for Erhard and est, a.e.c.

The tax court found that Margolis' representation of clients generally consisted of three phases. During the initial phase, the client's goals were defined and documents were drafted to realize the goals. Then, followed an implementation stage during which the required relationships were established. Finally, there was a clean-up phase when the client wished to terminate the contractual relationships. Where required, money movements would be made in order to complete the clean-up phase. *Erhard v. Commissioner,* 62 T.C.M. (CCH) 1, 3, 1991 WL 116587 (1991). In a memorandum of

May 1980, Margolis stated that at the time est, a.e.c. was formed in 1975, it was contemplated that the corporation would not exist for more than three years. *Id.* at 4.

In 1976, Margolis was indicted on criminal tax charges. He was acquitted of all charges in 1977, but after the indictment, Erhard allegedly became concerned about negative publicity surrounding Margolis' involvement in est, a.e.c. Further, the Margolis system was so complex that Erhard could not assess his own financial condition or that of est, a.e.c. Thus, in January 1980, Erhard announced the initiation of a project to "create est anew." To that end, Erhard formed a task force composed of est, a.e.c. executives, staff members, and outside legal advisors. In May 1980, Erhard issued a memorandum advising his staff that Erhard, Margolis, and the task force had jointly determined to replace Margolis as the general and tax counsel of est, a.e.c.

The task force recommended that Erhard convert the operation into a sole proprietorship. Accordingly, Werner Erhard and Associates ("WEA") was established as a sole proprietorship in February 1981. At this point, WEA needed to acquire the assets of est a.e.c. WEA also needed funds for the acquisition. As for the funds, Margolis indicated that, "[t]he truth is that there is no source other than the accumulated values of the past decade." *Id.* at 12.

The asset acquisition was accomplished in four phases. In the first phase, which occurred in June and July 1981, Erhard borrowed $2,200,000 from Terla, B.V., a system entity and $5,000,000 from Barclays Bank of San Francisco. Barclays Bank was not a system entity, but the loan was a back-to-back loan secured by Parallax Corp., a system entity.[2] Thus, the money lent to WEA originated with the system. WEA immediately transferred $4,950,677 back to various system entities, allegedly in payment for assets. However, out of the aggregate loan

---

**2.** A back-to-back loan occurs when a bank loan is collateralized with a cash deposit from a third party. When the loan principal is repaid, then the compensating deposit is released. In the Margolis' system accounting, a system entity's deposit securing a back-to-back loan was treated as a charge against the client receiving the loan from the bank. The client's account was credited when the loan was repaid and the deposit released back to the system entity.

proceeds of $7,200,000, Erhard retained $2,249,323 for operating expenses.

Phase two occurred on or about August 27, 1981 and was financed through three separate loans to WEA from Terla, a system entity, in the aggregate amount of $6,580,000. WEA retained $850,854 and transferred the rest back into the system through a number of system entities. Thus, in phases one and two, Erhard retained a total of approximately $3 million while the rest of the money cycled out of, and back into, the system.

Phase three took place on September 15, 1981. At this point, WEA owed approximately $13,800,000 in short-term debt to Terla and Barclays Bank. Erhard desired to replace his short-term debt with a long-term loan. Accordingly, Erhard called Wolfgang Somary, co-founder of Intercultural Cooperation Foundation ("ICF"), seeking to borrow money for WEA. ICF had no money to lend; however, shortly thereafter, Margolis called Somary and arranged for ICF to accept funds from a Margolis system entity and then to lend those funds to WEA. Margolis also contacted Fernando Flores, co-founder of the St. John Fundacion, who likewise agreed to act as a conduit for the loan so long as the funds were made available to him. As nonsystem entities, ICF and St. John were enlisted to participate because Erhard's outside lawyers regarded a fully disclosable source of the loan as essential to an acceptable asset acquisition plan.

The ultimate source of the $14 million eventually loaned to Erhard during phase three was Island Bank, a system entity. On September 15, 1981, Island Bank transferred $96 million to Sineuri, S.A., another system entity. From this amount, Sineuri transferred $15 million to Brown Education Corp. ("BEC"). BEC had been formed just prior to this transaction as part of Margolis' tax planning. BEC then purported to loan $14 million to ICF. BEC transferred the money to an account in the name of Everd van Walsum, a Margolis associate who was acting on behalf of ICF.[3] BEC was ostensibly loaning this money to ICF, yet ICF never provided BEC financial statements. The agreement that ICF and BEC did execute had been drafted with significant help from Margolis. Moreover, ICF agreed to receive funds from BEC only on condition that ICF would not be liable to BEC if WEA defaulted on the loan.

ICF then loaned the $14 million to St. John Fundacion, transferring the money to Paul Mason, a Margolis associate who was acting on behalf of St. John. Margolis also had a hand in drafting the documents executed between ICF and St. John. St. John then made a loan of $14 million to Erhard and WEA. St. John did nothing to ensure that the loan would be repaid by Erhard. Indeed, Flores immediately endorsed the instrument to ICF. BEC also assigned to Island Bank all right, title, and interest in the promissory note from ICF.

On the same day that Erhard received the money (which was the same day that all the above transactions occurred), Erhard transferred it all back to Island Bank, a system entity. Island Bank then transferred $8,976,284.95 to Terla B.V. as payment for the loans Erhard obtained during phases one and two. Island Bank also transferred $5,023,500 to Barclays Bank in payment for the loan Erhard obtained during phase one. Payment of the Barclays loan released the collateral deposit back to Parallax, the system entity that had secured the loan.

Phase four took place in December 1981, ostensibly because Erhard needed more money to complete the asset acquisition. This phase was financed with a $1 million demand loan again from ICF through St. John. The source of the funds was Antigua Banking, Ltd., and ABC Trust Company, both system entities. Over a four-month period, Antigua and ABC funneled the funds to the Harry E. Wright, Jr. Charitable Trust, a Margolis client. On August 27, 1981, the Trust transferred $750,000 to Island Bank. On December 17, 1981, the Trust transferred $250,000 to Island Bank. On December 18, 1981, Island Bank transferred $1 million to ICF. ICF then transferred $1 million to St. John, which on the same day transferred the funds to WEA. WEA then transferred the

---

3. BEC also transferred $1 million back to Island Bank.

$1 million, plus an additional $547,645 to est, a.e.c.

Thus, at the close of the four phases, WEA had acquired all of est, a.e.c.'s operating assets.[4] It had replaced its short-term loans and owed a total of $15 million, consisting of a $1 million demand loan and a $14 million long-term loan. Both loans were owed to ICF.

WEA paid interest to ICF on both the demand loan and the long-term loan. WEA properly withheld ICF's federal income tax from its payments to ICF and transmitted these amounts to the IRS. In early 1985, WEA paid $1 million, purportedly in repayment of the $1 million demand loan. However, Erhard transferred $550,000 directly to Island Bank rather than to ICF. Island Bank informed ICF that it would not release the $550,000 unless ICF initiated legal action in California to uphold the validity of the $14 million note in Erhard's then-active matrimonial action. Thus, of the $450,000 ICF did receive, it spent approximately $400,000 to defend the $14 million note.

On their returns for the tax years of 1981, 1982, and 1983, Erhard and WEA claimed depreciation and interest deductions based on the transactions described above. The IRS disallowed all the deductions and asserted additions to tax under sections 6653(a)(1), 6653(a)(2), and 6661, as well as increased interest under section 6621(c). Erhard petitioned the tax court for a redetermination of the asserted deficiencies, and the cases were assigned to Special Trial Judge Gussis for hearing. Erhard objected to the assignment on the ground that Judge Gussis was biased against Erhard because he presided over two prior cases involving est, a.e.c. The tax court denied Erhard's motion, and this court denied his petition for mandamus. After a six-week trial, the cases were assigned to Tax Court Judge Scott, who adopted Judge Gussis' opinion. The opinion held that Erhard was not entitled to interest or depreciation deductions because the transactions through which they were generated lacked economic substance, and it sustained the determination and imposition of increased interest under section 6621(c).

4. WEA had also acquired some artwork, an aux-

On September 3, 1991, Erhard filed a motion for reconsideration. The tax court reaffirmed its conclusions with regard to the disallowance of interest deductions and the determination and imposition of increased interest. The court determined, however, that Erhard was entitled to some depreciation deductions. The court then stated that "decisions will be entered under Rule 155." *Erhard v. Commissioner*, 64 T.C.M. (CCH) 10, 15, 1992 WL 153471 (1992). Erhard and the Commissioner disagreed about the appropriate computations under Tax Rule 155 and this appeal followed.

Erhard raises three issues on appeal: (1) the disallowance of interest deductions; (2) the imposition of increased interest; and (3) the tax court's computations of Erhard's deficiency.

## II

Erhard first argues that this court should remand the case to the tax court, asserting that Judge Scott improperly allowed the special trial judge to make the decision of the tax court.

The chief judge of the tax court may assign a case to be heard by a special trial judge, IRC § 7443A(b)(4); however, the special trial judge has no authority to decide the case. IRC § 7443A(c). Rather, the special trial judge submits a report to the assigned tax court judge, who must "review the work of the special trial judge." *Freytag v. Commissioner*, 501 U.S. 868, 871–72 n. 2, 111 S.Ct. 2631, 2635 n. 2, 115 L.Ed.2d 764 (1991). The litigants do not automatically receive a copy of the report and, therefore, are not routinely allowed to file objections to it.

Once the tax court judge has reviewed the report, she

> may adopt the Special Trial Judge's report, or may modify it or may reject it in whole or in part, or may direct the filing of additional briefs or may receive further evidence or may direct oral argument, or may recommit the report with instructions.

iliary sloop, and various recreational vehicles.

Tax Court Rule 183(c). Whichever course the tax court judge takes, she must presume that the special trial judge's findings of fact are correct, and she must give "[d]ue regard" to the fact "that the Special Trial Judge had the opportunity to evaluate the credibility of witnesses." *Id.* Here, Judge Scott adopted Special Trial Judge Gussis' report. Erhard was not permitted to file objections to the report prior to Judge Scott's action.

■ Erhard first argues that because the parties are not provided an opportunity to object to the special trial judge's report, it is likely that the special trial judge will end up deciding the case.[5] Indeed, permitting the litigants to file objections to the special judge's report might well decrease the danger that the tax court judge will simply endorse the report without review, *see* Linda J. Silberman, *Masters and Magistrates Part II: The American Analogue*, 50 N.Y.U.L.Rev. 1297, 1344 n. 268 (1975). Yet, absent such a procedure, the tax court judge will not necessarily abdicate her judicial responsibility. The Supreme Court has cautioned specifically that " 'rubber stamp' activity" on the part of the tax court judge is not to be assumed. *Freytag*, 501 U.S. at 905–07, 111 S.Ct. at 2653 n. 2.

■ Second, Erhard maintains that Judge Scott, in fact, did not adequately review the case. Erhard makes much of several quotes from Judge Scott where she admits that she relied on Special Judge Gussis' findings and did not examine every exhibit nor read the entire transcript. However, these admissions do not lead to the conclusion that Judge Scott's review was inadequate. First of all, Tax Court Rule 183 requires Judge Scott to give "due regard" to Judge Gussis' report on findings of fact and credibility. Further, the record in this case is so voluminous[6] that it was perfectly reasonable for Judge Scott not to read every word. Judge Scott made clear that while she did rely on Judge Gussis'

findings, she did not "take them carte blanche."

■ Finally, Erhard maintains that Judge Scott's comments during the reconsideration hearing showed that she misunderstood important facts. Erhard points out that Judge Scott mistakenly believed that ICF and the Harry E. Wright, Jr. Charitable Trust were system entities, and that Erhard owned stock in est, a.e.c. Erhard contends that these mistakes show that Judge Scott did not adequately review the record.

After carefully examining the record and Judge Scott's comments, we are convinced that Judge Scott's review of the case was adequate. Erhard points to isolated mistakes; however, Judge Scott's other comments indicate a satisfactory understanding of the case. Further, we believe that the few errors Judge Scott did make were understandable in light of the case's enormous complexity. Although the Wright Trust was not a system entity, it was a Margolis client, and the Commissioner has claimed that it was effectively controlled by Margolis. Similarly, ICF, though not a system entity, clearly took part in the transactions at Margolis' request and with his direction. Finally, Judge Scott's confusion about Erhard's ownership of est, a.e.c. also is understandable given that everyone seemed to acknowledge that Erhard was the "owner" of the business, and given est, a.e.c.'s purposefully complicated organization structure. Accordingly, we see no reason to remand.

### III

■ Erhard next challenges the tax court's finding of sham. The tax court's determination that a transaction is lacking in economic substance is a factual determination that this court reviews for clear error. *Karme v. Commissioner*, 673 F.2d 1062, 1065 (9th Cir.1982).[7]

---

5. Erhard analogizes special trial judges in the tax court to special masters and magistrates in the district court, pointing out that litigants in the district court are permitted to file objections to the special master's report before the district judge acts on it.

6. The transcript comprised 27 volumes.

7. Contrary to Erhard's contention, *Casebeer v. Commissioner*, 909 F.2d 1360, 1362 (9th Cir. 1990) does not set forth a de novo standard for review of sham transactions.

At issue here are interest deductions that Erhard claimed for the ICF loans and the Terla B.V. loans. Section 163(a) of the Internal Revenue Code provides for an income tax deduction for "interest paid or accrued within the taxable year on indebtedness." In order to be deductible, however, interest must be paid on genuine indebtedness, an indebtedness in substance and not merely in form. *Knetsch v. United States,* 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960). The burden is on the taxpayer to show that the borrowing scheme was a bona fide arrangement entered into for economic purposes, rather than merely a tax avoidance scheme. *Valley Title Co. v. Commissioner,* 559 F.2d 1139, 1141 (9th Cir.1977).

The tax court found that the transactions at issue here were without economic substance; that they were merely circular money movements that "began and ended with system entities, with no change in the economic position of the system viewed as a whole." 62 T.C.M. (CCH) 1, 26 (1991).

After conducting a detailed examination of each of the phases, the court concluded the following: In phases one and two, most of the borrowed money simply circled out of the system, through WEA, and back into the system. However, WEA retained approximately $3 million purportedly to use for operating expenses. In phase three, the entire $14 million loan circled through the system in one day. *Id.* After recounting the convoluted series of transactions involved in phase three, the court concluded that the "loans which had originated from system funds (directly or indirectly) in phases one and two were repaid with system funds in phase three, and the total amount of such repayments were returned, directly or indirectly, to the system." *Id.*

The court found that the $1 million loan in phase four followed a similar pattern. "Again, the funds originated in a money movement from the Margolis system through the Harry E. Wright, Jr., Charitable Trust, to Island Bank, Ltd., to Intercultural Cooperation Foundation to St. John Fundacion to WEA and from WEA to est, a.e.c." *Id.* Consequently, the tax court concluded that "the $14,000,000 and $1,000,000 loans pur-

portedly obtained by petitioner to finance the acquisitions were sham transactions completely lacking in economic substance." *Id.* at 27.

The court's findings of sham are based on its conclusion that the complex est, a.e.c. organizational structure was simply a means of shielding "the true ownership of assets that in reality belonged to the Werner Erhard operation." *Id.* at 28. The court concluded that the entire series of transactions "merely represented the so-called 'clean-up' phase in which the structure created by Margolis for Werner Erhard in 1975 was shed as a prelude to a new structure." *Id.* at 27. The court, noting that no "effort was made in the system accounting to differentiate between Werner Erhard and the entities (Erhard Seminars Training, Inc., and est, a.e.c.) which were used to conduct the Erhard business over the years," found that the system accounting simply served to reflect a client's cash position within the system. *Id.* Thus, when est, a.e.c. was to be dismantled in favor of a new structure, Erhard needed to balance accounts with the system and to remove the assets which, in reality were his, but which had been acquired in the name of various system entities.

> This was accomplished in the transactions which took place for the most part in phases one through four in 1981. Werner Erhard or (WEA) obtained all the business assets needed to continue his operations. Personal loans owed by Werner Erhard in substantial amounts were paid. He also acquired possession of art work valued at some $765,038 which had been held in the name of a system entity, the auxiliary sloop Sirona valued at $225,000 which had also been held in the name of a system entity and certain motor vehicles. It also appears that some $3,000,000 remained with Erhard (or WEA) as a result of the circular money movements in phases one and two.

*Id.*

Thus, the court concluded: "We believe that est, a.e.c. was in effect terminated as originally contemplated in 1975, a financial accounting was rendered for Werner Erhard covering some 10 years of close involvement

with the system and its entities, and the assets transferred to Werner Erhard in an artificial series of transactions that produced ... interest expense deductions." *Id.* at 28.

Although Erhard valiantly attempts to discredit these findings, we are more than satisfied that the tax court committed no clear error in finding that the transactions lacked economic substance.

Erhard first points out that est, a.e.c. was a multi-million dollar business before the asset purchase, as was WEA after the purchase. This, however, is beside the point. The tax court found the asset acquisition to be a sham, not because est, a.e.c. itself was a sham, but because Erhard never really bought est, a.e.c.

Second, Erhard maintains that the court's conclusions about circular money movements are contradicted by the court's own finding that WEA retained a portion of the borrowed funds. However, the court was fully aware that not all the money circulated. Indeed, the court found that the funds that Erhard retained constituted est, a.e.c.'s excess cash balances that needed to be transferred to Erhard in order to square the accounts. This conclusion is supported by the evidence. In a May 20, 1981 memorandum, Margolis indicated that when all the contemplated transactions were concluded, the cash position of est, a.e.c. would be reduced by $2,950,000 while the cash holdings of WEA would increase by that amount.[8]

Third, Erhard maintains that he had a clear business purpose for engaging in the transactions because he desired to terminate his relationship with Margolis.[9] However, even if Erhard had a legitimate business purpose for terminating his relationship with Margolis, that did not give him a business purpose for engaging in the specific transactions at issue here. The fact that he may have had a good business reason for separating from Margolis does not necessarily justify resorting to circular money movements (that just happened to create tax benefits) to effectuate that separation.

Finally, Erhard points out that even though the $14 million loan in phase three and the $1 million loan in phase four came from system entities and were immediately returned to system entities, Erhard nonetheless paid over $2 million in interest on the loans over the next several years. He also repaid the $1 million demand loan in 1985. These payments, according to Erhard, are evidence that he was genuinely indebted; after all, he would not have made any payments if the loans had been shams.

We agree that such payments would ordinarily indicate genuine indebtedness; however, the facts of this case immediately dispel such a suggestion. The evidence shows the following: Margolis created the amazingly complicated est, a.e.c. organizational structure, with its numerous offshore entities, in order that money could be "paid offshore in a deductible fashion, and then the money would find its way onshore in a non-income fashion." Reporter's Transcript, volume 22 at 102. Though nominally just an employee of est, a.e.c., Erhard was understood to be its owner. So, when Erhard decided to transform est, a.e.c. into a sole proprietorship, the assets that were ostensibly the property of est, a.e.c. were transferred to Erhard in exchange for payments that were really just circular money movements. Thus, during phases one and two, even though it appeared as though Erhard transferred millions of dollars to est, a.e.c. in exchange for assets, the system was the source not only for the purchase money but also for the additional $3 million that represented est, a.e.c.'s cash reserves.

---

8. Erhard also argues that the tax court erred as a matter of law by admitting inaccurate IRS charts as evidence of circular money movements. Erhard's claim is meritless, however. Erhard is correct that the charts do not include certain transactions, but it is clear from the court's opinion that the court was aware of and considered these transactions in making its determination.

9. Erhard also claims that the court applied the wrong test for business purpose. Erhard claims that because the court rejected his asserted business purpose argument on the ground that it was not "convincing," the court erroneously applied an objective test rather than a subjective test. 62 T.C.M. (CCH) 1, 28 (1991). However, Erhard seems to be arguing that unless the court blindly accepts Erhard's assertions, then it is applying an objective test. The text of the opinion shows that the court was not substituting its opinion for Erhard's. Rather, the court was merely stating that, based on the evidence, it did not believe Erhard's assertions.

Further, the convoluted, circular path of the two ICF loans in phases three and four simply makes it hard to believe that these loans were bona fide. The funds began with the system, went through two nonsystem entities in order to provide the transaction with legitimacy, and then went back to the system. Margolis was intimately involved in all these transfers. He arranged for the loans between BEC, ICF, and St. John, and he helped prepare the agreements between the parties. None of these parties knew each other before the transactions, nor did they conduct any of the investigations that are customary in an arms-length transaction. Given this evidence, the fact that Erhard made some subsequent payments to ICF does not lead to the conclusion that the tax court committed clear error in its finding of sham. Indeed, these payments to ICF can be explained in any number of ways [10] that are wholly in keeping with the tax court's conclusion that the transactions lacked economic substance.

## IV

■ Erhard next contends that the tax court erred in imposing increased interest. This court reviews the tax court's imposition of increased interest pursuant to section 6621 for clear error. *Wolf v. Commissioner*, 4 F.3d 709, 715 (9th Cir.1993).

Before its repeal, IRC section 6621(c) imposed increased interest on an understatement of tax to the extent that the understatement was a "substantial underpayment attributable to tax motivated transactions." Prior to 1986, the section defined "tax motivated transactions" as including only four specific types of transactions.[11] The Tax Reform Act of 1986, Pub.L. 99–514, 100 Stat. 2750, amended section 6621(c) to add "any sham or fraudulent transaction" to the list of tax motivated transactions. The Commissioner imposed increased interest on Erhard on the basis of this last category.

■ Erhard maintains that the legislative history indicates that a transaction does not come within the "sham or fraudulent transaction" category unless the transaction is a fraudulent version of one of the specific types of transactions that were originally defined to be tax motivated transactions.[12] However, Erhard's argument is not supported by language of the section or by precedent. *See Hildebrand v. Commissioner*, 967 F.2d 350, 353 (9th Cir.1992). *See also Estate of Carberry*, 933 F.2d 1124, 1129–30 (2d Cir.1991). The section, on its face, applies to *any* sham or fraudulent transaction. Thus, we reject the limitation Erhard urges as not plausible in light of the statute's clear language.

## V

■ Finally, Erhard challenges the tax court's computations under Tax Court Rule 155. Computations under Rule 155 are reviewed for an abuse of discretion. *Kelly v. Commissioner*, 877 F.2d 756, 760 (9th Cir. 1989). Erhard alleges that the tax court abused its discretion (1) by refusing to accept his computations as to the useful lives of the depreciable assets, and (2) by refusing to credit him for amounts that he withheld from his payments to ICF.

## A

■ Upon reconsideration, the tax court held that Erhard was entitled to depreciation deductions for certain assets that WEA acquired from est, a.e.c. The court directed that decisions would be entered under Tax Court Rule 155. The parties could not agree on the useful lines of those assets; therefore, each party submitted its own computation under Rule 155.

The Commissioner computed the useful lives of the assets by using the class life guidelines contained in the tables in Rev. Proc. 77–10, 1977–1 C.B. 548. Under this

---

**10.** For example, the payments could very well have been rendered as a part of the final accounting between Erhard and the system. That is, the transactions that occurred during the four phases may have been calculated to take account of Erhard's subsequent payments to ICF.

**11.** They were (1) any valuation overstatement; (2) any loss disallowed under the at-risk investment credit provisions; (3) any straddle transac-

---

tion; or (4) any use of an accounting method that created distortion.

**12.** Erhard argues that Congress added the "sham" category in order to reverse a line of tax court cases that refused to impose increased interest to a fraudulent straddle because fraudulent straddles are not really straddles.

method, the Commissioner allowed Erhard to depreciate the assets from the date that est, a.e.c. transferred the assets to WEA. Erhard maintains, by contrast, that the useful lives of the assets should be computed from the earlier date the assets were acquired by est, a.e.c. in the amount identified from the est, a.e.c. tax returns that had been admitted into evidence.

 A computation under Rule 155 must be made solely from the evidence in the record and the opinion of the tax court; it cannot be used to reopen the evidence or raise a new issue. Tax Court Rule 155(c). *See also Paccar, Inc. v. Commissioner,* 849 F.2d 393, 399–400 (9th Cir.1988). Here, the tax court found that Erhard's computation was an accounting opinion that raised a new issue of fact. Erhard disagrees, contending that, because the record already included est, a.e.c. tax returns, the remaining useful lives could be calculated "by simple mathematical computations from those returns."

The tax court did not abuse its discretion in refusing to accept Erhard's calculations. The record does not disclose the useful life of each of the assets which remained at the time of the asset acquisition. Rather, Erhard's computations are based on information from est, a.e.c. tax returns. Though the returns are in the record, they were not stipulated to for accuracy or truth, and the Commissioner had no opportunity to contest the accuracy of particular items on the returns. Thus, we agree with the district court that determining the accuracy of Erhard's computations would require reopening the record to permit opinion testimony from both Erhard's accountant and the Commissioner's expert.

### B

 WEA withheld amounts from its purported interest payments to ICF and properly remitted the withheld amounts to the IRS on ICF's behalf. Erhard now claims that since the Commissioner has determined that he never really had an obligation to pay interest to ICF, then he was not a bona fide withholding agent and thus must have made the payments to the IRS for his own account.

We are not persuaded by Erhard's argument. The amounts Erhard remitted to the IRS were withheld from payments to ICF and thus were in payment of ICF's tax, not Erhard's tax. Section 1464 provides that a refund or credit of an overpayment of tax which has actually been withheld at the source shall be made to the taxpayer from whose income the amount of such tax was in fact withheld. I.R.C. § 1464; Treas.Reg. § 1.1464–1(a); *Bank of America v. Anglim,* 138 F.2d 7, 8 (9th Cir.1943). Thus, the IRS may refund any overpaid amount only to ICF, the taxpayer from whose income the tax was withheld. That the IRS deemed the loans shams does not transform payments made on behalf of ICF into payments made on behalf of Erhard. Erhard withheld that money on ICF's behalf regardless of the underlying purpose of the payments.

AFFIRMED.