**MARLAR, INC., Plaintiff–Appellee– Cross–Appellant,**

v.

**UNITED STATES of America, Defendant–Appellant– Cross–Appellee.**

**Nos. 96–36036, 96–36104 and 96–36218.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 3, 1998.

Decided Aug. 5, 1998.

Wendy S. Pearson (argued), Pearson Law Offices, Seattle, WA; F. Michael Kovach, Mair, Camiel & Kovach, Seattle, WA, for plaintiff-appellee-cross-appellant.

Bruce R. Ellisen (argued) and Alice L. Ronk, Tax Division, United States Department of Justice, Washington, DC, for defendant-appellant-cross-appellee.

Before: BROWNING, SKOPIL, and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must decide whether an adult-entertainment club, on the facts of this case, is liable for federal employer taxes on the amounts nude dancers received from customers.

## I

Marlar, Inc., operates an adult entertainment establishment, known as "Club Extasy," offering nude and seminude dancing to the public. During the two tax years at issue, 1990 and 1991, Marlar's operations were as follows. Upon entering the club, customers had to pay a cover charge and buy a soft drink. Without further expense, they could mingle with the dancers and watch them perform on the main stage. Alternatively, they could pay extra for more, one might say, personalized attention. Any customer could offer a "ladies' drink" (a $10, 12–ounce soft drink) to the dancer of his choice. If the dancer accepted the drink, she would sit and talk with the customer in return. During this conversation, she would usually take the opportunity to market one of the performances in her repertoire, such as a "table dance" ($5), a "couch dance" ($12), or a "private stage dance" (prices variable).[1]

Consistent with near-uniform industry practice in the Seattle area, Marlar treated its dancers as "lessees" rather than employees or independent contractors. Each dancer signed a "Dancer Performance Lease," under which Marlar, as "landlord," provided stages and dance facilities. In exchange, the dancer, as "tenant," paid a "rental fee."[2]

The dancers received *no* payment from Marlar or the customers for main-stage dancing, aside from the occasional tip. They earned their money from the one-on-one performances. Their compensation came in three forms. First, customers usually paid cash for the personal performances. The dancers kept 100% of the amounts received. Second, customers sometimes paid the dancers with scrip, known as "Extasy Bucks," which the customers purchased from the club with their credit cards. The dancers redeemed the scrip for cash from the club, which retained ten percent of the face value as a "service charge." Third, the dancers received from the club a $10 credit (treated as a rent abatement) for each of the first four ladies' drinks purchased for them on a given night.[3] The dancers do not report their earnings to Marlar, and Marlar claims not to know their relative incomes.

Marlar has never paid employment taxes on the dancers' remuneration or filed employment tax returns. In 1994, the IRS audited Marlar, determined that the dancers were employees, and assessed employment taxes totalling $282,082.11 (plus interest and penalties) for tax years 1990 and 1991. Marlar made a partial payment of this assessment and then brought this action for a refund.[4] The United States filed a counterclaim for the balance of the assessment.

Before the district court, Marlar moved for summary judgment. Marlar contended that: (1) the dancers were its lessees, rather than its employees; and (2) even if the dancers were its employees, it was nonetheless entitled to the protections of § 530 of the Reve-

---

1. These rates, which Marlar posted inside the club, were only the standard rates, charged for standard performances. The parameters of such personal performances were regulated by local ordinance. Dancers, however, regularly offered optional illegal performances, called "dirty dancing," at higher-than-posted rates. "Dirty dancing" involved displaying more skin or maintaining more body contact than allowed by law.

2. This fee was $40 per day plus a $2 surcharge for each couch dance plus a $5 surcharge for each private stage dance.

3. Because the nightly base rent is $40, the credits would reduce the rent to zero if the dancer received four drinks.

4. Marlar paid the employment taxes attributable to one worker's earnings for each quarter in tax years 1990 and 1991. The total amount of the taxes paid was $2,928.

nue Act of 1978, Pub.L. No. 95–600, 92 Stat. 2763, 2885–86, § 530.[5] This section provides a safe-harbor which shields a taxpayer of employment tax liability if, *inter alia*, (a) the taxpayer's treatment of the workers as non-employees was in *reasonable reliance* on industry practice, and (b) the taxpayer *filed all requisite federal tax returns* consistent with the treatment of the workers as non-employees. *See id.* The United States opposed the motion for summary judgment, contending that there were genuine issues of material fact as to (1) whether the dancers were lessees, as opposed to employees, and (2) whether Marlar met the two requirements for relief under § 530.

The district court granted Marlar's motion for summary judgment. *See Marlar v. United States,* 934 F.Supp. 1204, 1210 (W.D.Wash.1996). Although the court agreed with the government that there was a genuine issue as to whether the dancers were lessees, *see id.* at 1208, it held that § 530 relieved Marlar from employment tax liability, *see id.* at 1210. The court found that a significant segment of the industry treats the dancers as lessees, not employees, and that Marlar patterned its business relationship with its dancers on this industry practice. *See id.* at 1209.

Marlar then applied for an award of litigation costs, including attorney's fees, under Internal Revenue Code (I.R.C.) § 7430. The district court granted the costs after finding that the government's position "was not consistent with the plain language of section 530" and that "[t]he government offered no evidence that Marlar's practice was inconsistent with 'long-standing recognized practices of a significant segment of the industry.'" The court, however, capped the hourly rate of attorney's fees at $75, on the basis that there were no special circumstances justifying a larger amount. The court thus awarded Marlar $27,332.65 in costs and fees.

The government appealed both the grant of summary judgment and the grant of litigation costs. Marlar cross-appealed, challenging the $75–per–hour limitation on attorney's fees.[6]

## II

There are two federal taxes at issue in this appeal: Federal Insurance Contributions Act ("FICA") taxes and Federal Unemployment Tax Act ("FUTA") taxes.[7] Whereas an employer is subject to both taxes, a lessor is subject to neither. When a lessee receives payments from its customers, the lessor does not incur either FICA or FUTA tax liability. The government's theory in this case is that Marlar chose to treat the dancers as "lessees" only to avoid paying these taxes.

Section 530 of the Revenue Act of 1978 is a safe-harbor rule which shields certain persons from employment tax liability even if they might be employers.[8] To reiterate, ex-

---

5. Section 530 was originally enacted by Congress to provide interim relief for taxpayers who were involved in employment tax controversies with the IRS. It was temporarily extended twice and then extended indefinitely by § 269 of the Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248, 96 Stat. 324, 552, § 269. Section 530 was never codified, but it is reproduced in the notes following 26 U.S.C. § 3401.

6. Marlar also contended, in its cross appeal, that there is an alternative basis for summary judgment: it had no obligation to withhold taxes because it did not pay the dancers. We need not reach this issue, however, for the reasons discussed below.

7. FICA imposes two obligations on an employer. First, the employer is required to withhold the *employee* share of the tax. *See* I.R.C. § 3102(a). Second, the employer has to pay *its* share of the tax. *See* I.R.C. § 3111. FUTA also imposes a

tax on the employer based upon the amount of wages paid to employees. *See* I.R.C. § 3402(a).

8. Section 530 provides, in relevant part:

(a) Termination of certain employment tax liability.

(1) In general. If–

(A) for purposes of employment taxes, the taxpayer did not treat an individual as an employee for any period, and

(B) in the case of periods after December 31, 1978, *all Federal tax returns (including information returns) required to be filed by the taxpayer with respect to such individual for such period are filed on a basis consistent with the taxpayer's treatment of such individual as not being an employee,* then, for purposes of applying such taxes for such period with respect to the taxpayer, the individual shall be deemed not to be an employee unless the taxpayer had no *reasonable basis* for not treating such individual as an employee.

cept as provided elsewhere in the statute, § 530 relieves a taxpayer of employment tax liability if *both* (1) the taxpayer reasonably relied on something such as industry practice, and (2) the taxpayer filed all necessary forms consistent with the treatment of the workers as not being employees. Consequently, as applied to this case, § 530 shields Marlar from employment tax liability—even if the dancers are actually "employees"— provided Marlar shows that it (1) reasonably relied on the long-standing recognized practice of the Seattle-area nude-dancing industry, and (2) filed all requisite forms consistent with the treatment of the dancers as lessees.

The government contends that the district court's grant of summary judgment was in error because of two genuine issues of material fact. First, the government argues, although Marlar relied on industry practice, there is sufficient evidence demonstrating that this reliance was not "reasonable." Second, the government claims there is a genuine issue as to whether Marlar filed all necessary forms; specifically, the government claims that Marlar may have been required, with respect to each dancer, to file Form 1099, which reports payments made in a trade or business, a form it never filed. We address these two arguments in turn.

### A

The district court held that Marlar satisfied the first requirement of § 530 because "it is undisputed that the industry treats dancers as lessees" and because Marlar relied on this practice. *Marlar,* 934 F.Supp. at 1210. The court did not grapple with the issue of whether Marlar's reliance on industry practice was *reasonable.* Instead, the court simply concluded "that § 530's safe haven provision applies to Marlar, when vir-

tually the entire industry treats dancers as lessees." *Id.* at 1209.

The government challenges the district court's interpretation of the statute. According to the government, the statute requires that reliance on industry practice be reasonable. In this case, the government claims, there is at least a genuine factual issue as to whether Marlar's reliance was reasonable.

### 1

■ As an initial matter, we must agree with the government that, under § 530, any reliance on industry practice must be "reasonable." As Congress provided, in no uncertain terms: ·

> [A] taxpayer shall in any case be treated as having a reasonable basis for not treating an individual as an employee for a period if the taxpayer's treatment of such individual for such period was in *reasonable reliance* on any of the following:
>
> . . . .
>
> (C) long standing recognized practice of a significant segment of the industry in which such individual was engaged.

Revenue Act of 1978, § 530(a)(2) (emphasis added). The text unmistakably requires "reasonable reliance," not just mere reliance. When "the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)).

Marlar's interpretation of § 530—that mere reliance on industry practice is sufficient—ignores the word "reasonable." To Marlar, it would seem, Congress could have deleted the word "reasonable" without any

---

(2) Statutory standards providing one method of satisfying the requirements of paragraph (1). For purposes of paragraph (1), a taxpayer shall in any case be treated as having a reasonable basis for not treating an individual as an employee for a period if the taxpayer's treatment of such individual for such period was in *reasonable reliance* on any of the following:
(A) judicial precedent, published rulings, technical advice with respect to the taxpayer, or a letter ruling to the taxpayer;

(B) a past Internal Revenue Service audit of the taxpayer in which there was no assessment attributable to the treatment (for employment tax purposes) of the individuals holding positions substantially similar to the position held by this individual; or
(C) *long-standing recognized practice of a significant segment of the industry in which such individual was engaged.*
Revenue Act of 1978, § 530 (emphasis added).

loss of meaning whatsoever; the safe-harbor would be available so long as "the taxpayer's treatment of such individual for such period was in reliance on [long-standing industry practice]." Because "legislative enactments should not be construed to render their provisions mere surplusage," *Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 117 S.Ct. 913, 917, 137 L.Ed.2d 93 (1997), we must, and do, reject Marlar's interpretation and hold that the statute indeed requires reasonable reliance.[9]

### 2

Nevertheless, although we agree with the government's construction of the statute, we do not share the government's belief that the mere presence of the word "reasonable" necessarily converts our inquiry into a factual one suitable for trial. To the contrary, we conclude that there is no genuine issue that Marlar's reliance was in fact reasonable.

We begin by noting that the district court was unable, on summary judgment, to determine whether the underlying relationship between Marlar and its dancers was one of employer-employee or lessor-lessee. *See Marlar*, 934 F.Supp. at 1208. The court recognized that the classification turns on the common law test of an "employee," *see id.* at 1206–07 (quoting 26 U.S.C. § 3121(d)(2)), a test which looks to a multitude of factors, the most significant of which is the degree of control the master exerts over the worker. *See General Inv. Corp. v. United States*, 823 F.2d 337, 341 (9th Cir.1987). As the district court noted, summary judgment was inappropriate because "relevant facts are disputed here as to the degree of Marlar's control and the dancer's independence." *Marlar*, 934 F.Supp. at 1208. The government has never contended that the dancers are employees as a matter of law,[10] and for good reason: Because the dancers have discretion in deciding for whom, when, and how to perform, there is a serious question as to whether they are employees under the common law definition.[11] Most notably, the

9. Marlar has given us no reason to ignore § 530's text. Indeed, the plain language is supported by the safe-harbor's legislative history. There is some indication that Congress understood that mere reliance should be insufficient; for example, one legislative report observes that *a taxpayer should not be allowed to rely on* industry practice when doing so would "constitute negligence or intentional disregard of rules or regulations, or fraud." S.Rep. No. 95–1263, 95th Cong., 1st Sess. (1978), U.S.Code Cong. & Admin.News 1978 p. 6761.

Moreover, the cases cited by Marlar are not inconsistent with our conclusion that a taxpayer's reliance must be reasonable for § 530 to apply. *See Springfield v. United States*, 88 F.3d 750, 754 (9th Cir.1996); *General Inv. Corp. v. United States*, 823 F.2d 337, 341 (9th Cir.1987). In those cases, the reasonableness of the reliance was not at issue; we simply addressed what constituted a long-standing industry practice.

10. The most the government has said is that the entire leasing arrangement might have been a mere "sham"—a transaction lacking in economic substance, entered into solely to create tax benefits. *See Erhard v. Commissioner*, 46 F.3d 1470, 1476 (9th Cir.1995). According to the government, the dearth of economic substance in the lessor-lessee relationship is evidenced by Marlar's failure to enforce the terms of the lease. As Marlar's president, Larry Miller, testified: "[I]n our practice, we essentially collected rent, asked [the dancers] to comply with city regulations, and beyond that, we really did not pay attention

to much of this contract." Indeed, the only provision of the lease that appears to have been enforced was the requirement that the tenant perform on the landlord's main stage. Nevertheless, although we agree that this failure to enforce the lease diminishes the possibility that a *reasonable person could find the relationship to be one of lessor-lessee*, we are unable to conclude that there is *no* genuine issue of fact. Even though the arrangement between the club and its dancers lacks some characteristics typical of a lease, it also lacks the control typically found in an employment relationship, as discussed *infra*. The leasing arrangement is colorable.

11. The adult entertainment cases, *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 329 (5th Cir. 1993), and *Matcovich v. Anglim*, 134 F.2d 834, 837 (9th Cir.1943), do not belie this conclusion. Although both courts held the dancers to be "employees," they did so only after a trial—not on summary judgment—thus suggesting that there *had* been a genuine issue of fact on the issue of control. Moreover, because any two companies in an industry might differ in the amount of control they exert over their workers, it is certainly possible that one might be an "employer" while the other is not. Accordingly, Marlar might not be an employer even though the establishments at issue in *Circle C. Investments* and *Matcovich* were employers. Significantly, in those cases, there was no suggestion that the performers had discretion to refuse customers and to negotiate performance content and price.

dancers can refuse to perform for a customer; indeed, they can even decide not to do *any* personalized dances on a given night. Moreover, if they do choose to dance, they negotiate with the customer on what the performance will entail and how much it will cost. A reasonable person could conclude that Marlar's dancers, in light of their discretion, are not employees but lessees. Assuredly, "reasonable minds could differ as to the import of the evidence." *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

This conclusion is most significant in determining the reasonableness of Marlar's reliance. Because a reasonable person could find that the dancers are lessees instead of employees, it certainly follows that a reasonable person could also find that the industry's practice—of treating the dancers as lessees—is legally correct. Considering the ambiguity of the relationship between the club and its dancers, we cannot fault Marlar for relying on the industry practice. In short, the reliance was reasonable because a reasonable person could find the practice to be correct.

Moreover, this conclusion is reinforced by the IRS's own evaluation of the industry's tax treatment of nude dancers. Prior to this suit, the IRS audited one of Marlar's competitors, JJR Inc., a company that conducted its business much the same way as did Marlar.[12] The IRS approved of JJR's classification of the dancers as lessees, and made no assessment of employment taxes. *See JJR, Inc. v. United States*, 950 F.Supp. 1037, 1044 (W.D.Wash.1997). In light of its informed determination, it should come as no surprise to the IRS that we too hold the industry's treatment of the dancers as lessees to be reasonable.

### B

▪ To fit within the safe-harbor of § 530, however, reasonable reliance on industry practice is not sufficient standing alone. A taxpayer must also file "all Federal tax returns (including information returns) re-quired to be filed by the taxpayer ... on a basis consistent with the taxpayer's treatment of [the worker] as not being an employee." Revenue Act of 1978, § 530(a)(1)(B). According to the government, one of the returns that Marlar had to file—but did not—was Form 1099, which reports the "payments" made by a trade or business. For purposes of this appeal, Form 1099 is required of "[a]ll persons engaged in a trade or business and making *payment* in the course of such *trade or business* to another person" in excess of $600. I.R.C. § 6041(a) (emphasis added). As its plain language suggests, § 6041 is triggered by payments of $600 or more made in a *trade or business;* there need not be an employer-employee relationship. Industry practice is also irrelevant. To the extent the district court suggested otherwise, it was incorrect. *See Marlar*, 934 F.Supp. at 1209–10 ("There is no evidence that other clubs filed Forms 1099 during the period in question—1990 and 1991.... Here it is undisputed that the industry treats dancers as lessees. A lessor/lessee relationship does not require filing of a Form 1099."). Because Marlar operated a business for the tax years in question, it conceivably might have been required to file Form 1099.

The dispositive issue is whether Marlar made "payments" to the dancers within the meaning of the statute. The dancers received three forms of compensation: (1) cash from the customers; (2) scrip from the customers which was exchanged for cash; and (3) rent credit for the ladies' drinks. If any of these transfers constitute "payments" from the club to the dancers, there would be a genuine issue as to whether Marlar made payments in excess of $599 in any year, thereby triggering the § 6041 reporting requirement.

▪ Neither the Code nor the regulations define "payment." We need not, and do not, attempt to determine ourselves the precise contours of the definition of "payment." The government conceded at oral argument that Marlar made no "payment" when the cus-

---

12. JJR is the subject of the companion case before us, as to which we have filed a memoran-dum disposition contemporaneously herewith.

tomers gave the dancers cash. The only question before us, therefore, is whether Marlar made a "payment" when it exchanged cash for scrip or when it awarded ladies' drink rent credits. To answer this question, we need simply recognize the eminently logical proposition that a transferor of funds does not make a "payment" when it acts as a mere conduit or disburser of the funds. If, for example, the dancer asks the club to cash a check or to exchange two ten-dollar bills for a twenty, the club clearly has made no "payment" for the purposes of triggering a Form 1099 reporting requirement.[13]

### 1

The exchange of cash for scrip was functionally no different than cashing a check or asking for change. In either case, the club was a mere disburser of funds; it did nothing more than exchange one item of value for another. The club did not have any meaningful influence over the amount of income that the dancers received from the customers. As discussed above, the dancers could decide independently when to perform personalized dances.[14] Because the club was simply a financial intermediary—scarcely more significant than a messenger transferring the cash from customer to dancer—the club made no "payments" when it exchanged cash for scrip.

The government nevertheless asserts that a relevant consideration is that Marlar retained 10% of the face value of the scrip as a "service charge." However, the fact that Marlar shared the dancers' receipts does not imply that Marlar made "payment" of these receipts.[15] Just as there would be no payment from club to dancer if Marlar charged a check-cashing fee or a change-providing fee, there is no "payment" when Marlar exchanges cash for scrip.

### 2

The rent credits attributable to ladies' drinks were not "payments" either. Once again, Marlar was nothing but a conduit of funds. Whether a dancer talked to a customer and accepted the drink was entirely up to the dancer. The dancers were allowed to refuse, and often did refuse, an offer for a drink and the accompanying credit. Marlar imposed no obligation whatsoever. The mere fact that the proceeds from the sale of a ladies' drink took a momentary stop in Marlar's cash register does not render the rent credit a "payment" from the club to the dancer.

### C

Thus, Marlar satisfied both requirements for § 530 protection: It reasonably relied on industry practice, and it filed all necessary forms. Because Marlar fell within the safe-

---

**13.** Were we to disagree, there would be no logical way to preclude a patently absurd result: a messenger, a postal worker, and an armored-car employee would all be required to file a Form 1099 whenever they carried funds in excess of $600, as they too operate as a conduit. Because statutes should be interpreted so as to avoid patently absurd results, *see, e.g., United States v. Wilson,* 503 U.S. 329, 334, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992); *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 266, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), we cannot accept such a broad definition of "payment."

**14.** The dancers could not refuse to perform on the main stage; however, they received no remuneration for such dances, aside from the occasional inconsequential tip. Marlar's control over this aspect of the dancers' tenure at the club does not suggest in any way that Marlar was something more than a mere conduit of the funds transferred via scrip from customer to dancer. Similarly, Marlar's ability to hire and to fire dancers, to demand "house" meetings, and to

penalize dancers for tardiness and breaking other rules—though relevant to the characterization of the working relationship as employer-employee or lessor-lessee—does not affect Marlar's status as a conduit. Notwithstanding this control over the dancers, the purchase of a personalized dance was, in substance, a transaction between the customer and the dancer only; Marlar did not have a relevant role in this transaction.

**15.** The Fifth Circuit case of *United States v. Fleming,* 293 F.2d 953 (5th Cir.1961), is not to the contrary. Although the cab company and the cab drivers in *Fleming* also shared their gross receipts, there is a dispositive distinction: the company was more than a financial intermediary exacting a service charge. The company prohibited the drivers from using the cabs for any personal matters, so the drivers could not refuse generally to pick up passengers. *See id.* at 957. Moreover, although the drivers had a theoretical right to refuse individual trips, they "almost never exercised [this right] in practice." *Id.*

harbor, the district court did not err in granting its motion for summary judgment.[16]

### III

■ Marlar requested and the district court awarded litigation costs, including attorney's fees, pursuant to I.R.C. § 7430, a fee-shifting statute applicable to tax cases in which the United States is a party.[17] There are several limitations to a district court's power to award fees, but only one that is relevant to this case: Fees shall not be awarded if the United States establishes that its position in the proceeding was "substantially justified." I.R.C. § 7430(c)(4)(B)(i). The Supreme Court has interpreted "substantially justified" to mean "justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988).[18] The United States' position need not be correct to be "substantially justified"; it need only have "a reasonable basis in law and fact." *Id.* at 566 n. 2, 108 S.Ct. 2541.

■ As explained above, the district court incorrectly thought that § 530 merely requires reliance on industry practice, and not *reasonable* reliance on such practice. Consequently, the court underestimated the government's argument. We do not decide, however, whether the government's position rises to the level of "substantially justified." The district court is in a better position to decide this attorney's fees question. *See Harmon v. San Diego County*, 736 F.2d 1329, 1331 (9th Cir.1984). We therefore remand the issue for reconsideration in light of our interpretation of § 530.

### IV

For the foregoing reasons, we affirm on the merits and remand the attorney's fees

question to the district court. Each party shall bear its own costs on appeal.

**AFFIRMED IN PART AND REMANDED IN PART.**

---

**16.** Having concluded that Marlar fell within the § 530 safe-harbor, we need not consider the alternative basis for affirming the district court raised in Marlar's cross-appeal.

**17.** Section 7430 states, in relevant part:

In any administrative or court proceeding which is brought by or against the United States in connection with the determination, collection, or refund of any tax, interest, or penalty under this title, the prevailing party

may be awarded a judgment or a settlement for –

. . . .

(2) reasonable litigation costs incurred in connection with such court proceeding.

I.R.C. § 7430(a).

**18.** *Underwood* addressed the attorney's fees provision within the Equal Access to Justice Act, 28 U.S.C. § 2412(d), a provision which is substantially identical to § 7430.