NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0090n.06

No. 08-5945

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Feb 16, 2010**
LEONARD GREEN, Clerk

UNITED STATES OF AMERICA,            )
                                     )
    Plaintiff-Appellee,          )
                                     )   ON APPEAL FROM THE UNITED
v.                                   )   STATES DISTRICT COURT FOR THE
                                     )   WESTERN DISTRICT OF KENTUCKY
MICHAEL SALISBURY,                   )
                                     )
    Defendant-Appellant.

Before:  SUHRHEINRICH, SUTTON and COOK, Circuit Judges.

SUTTON, Circuit Judge.  Michael Salisbury appeals his conviction and sentence for two counts of misdemeanor tax evasion.  We affirm.

I.

From 1997 to 2002, Michael Salisbury helped Owsley Brown Frazier assemble one of the nation's foremost collections of antique firearms.  Salisbury began by scouring the country for guns for Frazier to buy and eventually became president of a museum Frazier founded to house the collection.  In 2002, however, Salisbury left the museum under suspicion of false dealings.

The government followed up in 2007 with criminal charges of wire fraud, conspiracy to commit wire fraud, money laundering, conspiracy to commit money laundering and four counts of

tax evasion. The charges all related to profits Salisbury had made from selling guns to Frazier for more than he had paid for them. The government said that Salisbury "con[ned]" Frazier about the prices, R.256 at 16, while Salisbury said he took the same markup that any dealer would have taken for finding and selling antiques given Frazier's suggestion to "take care of yourself," *id.* at 19.

Salisbury made large profits from these transactions but failed to pay all of the taxes on them. In the years for which he was convicted, 2000 and 2002, he reported no relevant income in the first year, and $247,888 in "seller premiums" (listed under capital gains) in the second. R.182 at 105. After the controversy with Frazier and the museum arose, Salisbury filed amended tax returns to account for some, though not all, of the additional income from his gun sales. In those amended returns he included an additional $16,500 in income in 2000 and $71,036 in 2002, both accompanied by the explanation that "Taxpayer thought items were not to be reported as income until sold." R.182 at 83, 110.

According to the government, even after Salisbury amended his returns he still had understated his income by $298,749 in 2000 and by $622,372 in 2002, meaning that he should have paid an additional $119,896 and $241,581, respectively. Salisbury's expert, William Jessee, used a different accounting method in concluding that Salisbury understated his income by just $12,574 in 2000 and by $813,109 in 2002, corresponding to tax liabilities of $3,787 and $399,129.

The jury acquitted Salisbury of every charge in the indictment but found him guilty of two lesser-included counts of willful failure to pay taxes for 2000 and 2002. *See* 26 U.S.C. § 7203. At

sentencing, the court found that the tax loss was a little over $1 million once interest and penalties were included, giving Salisbury a base offense level of 22 and a guidelines range of 41 to 51 months. *See* U.S.S.G. §§ 2T1.1, 2T4.1. Because the statute capped the sentence at twelve months for each count, the district court sentenced him to 24 months of incarceration plus one year of supervised release and a $25,000 fine.

## II.

Salisbury argues that the district court abused its discretion by limiting his expert witness's testimony—by forbidding William Jessee to testify not only about Salisbury's lack of willfulness but also about other "predicate matters" from which the jury could infer a lack of willfulness. We disagree.

Rule 704(b) of the Federal Rules of Evidence bars experts from testifying directly to the "ultimate issue" of a criminal defendant's state of mind, which would include Salisbury's willfulness. But it does not bar experts from testifying to facts that *relate* to state of mind. *See United States v. Frost*, 125 F.3d 346, 383–84 (6th Cir. 1997). As Salisbury sees it, the district court should have permitted expert testimony that, for instance, Salisbury did not understand certain regulations and accounting principles.

This argument, however, mischaracterizes the district court's ruling. While the court rejected some parts of Jessee's proposed testimony on Rule 704(b) grounds, that was not the ground on which the court premised the rulings that Salisbury targets here. As to these, the court was concerned that

the proposed testimony went beyond Jessee's knowledge and expertise, all Rule 701 problems, not

that it went to Salisbury's intent, a Rule 704 issue.

Context confirms the point. Salisbury initially said that Jessee would testify that "there is

significant evidence that Mike [Salisbury] did not intend to evade taxes in tax years 1999 through

2002." R.232-1 at 2. The government objected on Rule 704(b) grounds. The court sustained the

objection as to "the defendant's intent," but said it would still allow testimony "that Van Talley

[Salisbury's tax-preparer] was confused or that the IRS was confused." R.233 at 5. Salisbury moved

for clarification of the order, making an argument similar to the one he makes here. While the

motion did not include a proffer, it noted:

> For example, Mr. Jessee should be allowed to opine on whether Mr. Salisbury
> understood the applicable IRS regulations and reporting procedures, his knowledge
> of reporting requirements under Schedule C, the proper way to consider gun
> inventory and sales income, whether Mr. Talley provided incorrect advice with
> regard to those issues, whether Mr. Salisbury's books and records revealed any
> attempt to conceal income or falsify records, and related issues.

R.163 at 2 n.1. The court acknowledged Salisbury's argument but found Rule 704(b) inapplicable.

The proposed subject, it explained, was "not a predicate issue because [it] is not the ultimate issue.

. . . [T]he ultimate issue is not whether Mr. Salisbury was a[] . . . tax accounting expert." R.235 at

24.

The court nevertheless excluded much of the proposed testimony, finding that it would be

lay testimony, not expert testimony, and finding that Jessee did not have firsthand knowledge of

whether Salisbury had misunderstood the regulations or whether Salisbury mistakenly relied on advice from Van Talley. The court therefore ruled that Jessee could not testify about "what advice Mr. Talley provided, but . . . can speak to whether or not the returns that were prepared by Mr. Talley were in his view correct." *Id.* at 31.

Salisbury in the end misplaces his challenge to the ruling. His appellate briefs make no argument that the district court erred by treating Jessee's testimony as lay testimony or by rejecting it for lack of first-hand knowledge. And that may well be for good reason: It is difficult to see how Jessee, who was not on the scene at the time of Salisbury's 2000 and 2002 tax filings, could be an appropriate fact witness about Salisbury's understanding of the regulations or of Talley's advice. No reversible error occurred.

III.

Salisbury next complains that, even though the district court limited the testimony of his expert witness, it allowed IRS agent Deborah Wolfe to testify about predicate matters *and* the ultimate issue of his willfulness. Because the defense invited the statements in question or failed to object to them, or both, these claims fail as well.

Ms. Wolfe's short direct examination addressed her calculation of Salisbury's tax deficiencies, not his state of mind. The defense, however, cross-examined her not only about her calculations but also about Salisbury's intent. Not surprisingly, as a result, she answered the defense's questions by talking about inferences that could be drawn about his state of mind.

The defense did not object to most of these answers. For example, after asking, "not only did Mike not put down income on the guns that he sold and had in his inventory, he also didn't put down the expenses, did he?" the defense made no objection when she responded, "[n]o, he didn't. It . . . would have defeated the purpose of hiding the income." R.285 at 11. That answer, while approaching the line of forbidden state-of-mind testimony, was not so clearly over the line—or so prejudicial—that the district court committed plain error by not striking it *sua sponte*.

The defense not only failed to object to some answers but it also invited others. For example, the defense asked her, "[y]ou think maybe he wasn't telling the truth about that as well?" and she answered "[w]ell, it's been my experience, if they're deceptive in one area, they're deceptive in another, yes." *Id.* at 12. That answer may well be *less* violative of Rule 704(b) than the answer contemplated by the question.

Salisbury complains about her testimony that "you've got to show that there are indications that [Salisbury] meant to defraud, and he obviously did." R.284 at 24. While Salisbury preserved an objection to this testimony, the testimony's full context puts it in a different light:

> [Defense counsel]: My question is, do you have any evidence that [Salisbury] was not making a good faith attempt to correct deficiencies in his originally filed tax returns, evidence, ma'am?
>
> A. I can't read his mind.
>
> Q. I didn't ask you to be a mind reader. I asked if you—
>
> A. How could I possibly?
>
> Q. —had evidence.

A.  How could anyone?

Q.  Then the answer is no, isn't it?

A.  Then the—he shows all the indications of fraud but—

Q.  Now—

A.  —like I said, unless you read his mind—

MR. SONNETT:  Your Honor, that's unresponsive and I ask that it be stricken.

THE COURT:  I'm not going to strike the testimony.  You need to let the witness finish her answers, Mr. Sonnett.

A.  Even what you—what you showed before about showing intent of fraud, you're—it's such a—you know, what is the burden of proof there?  You've got to show that there are indications that he meant to defraud, and he obviously did.  The amended return, the—putting money into his wife's name, the unreported—he didn't unreport.  He underreported.  You see how he put $18,000 of hobby income and yet—

Q.  Ms. Wolfe—Ms. Wolfe, you're not answering my question.

A.  I thought I was.

*Id.* at 24–25.  Although the question, "do you have any evidence that [Salisbury] was not making a good faith attempt to correct deficiencies?" technically "call[s] for a yes or no answer[]," *id.* at 24, 26, it is hardly surprising that a witness would answer the question by describing the evidence rather than merely saying it exists.  And, of course, even if the district court had forced Wolfe to give a "yes" or "no" answer and leave it at that, the government surely would have been permitted to ask her to elaborate why on redirect.  It also is no surprise that the witness would leap from "evidence" that Salisbury failed to make a "good-faith attempt" to a *conclusion* that he did not make a good-faith attempt.  The district court did not abuse its discretion in finding that the defense "reap[ed] what it" sowed when it asked these questions and in ultimately permitting this testimony.  *Id.* at 25.

IV.

Salisbury next protests the district court's refusal to give his proposed "good faith" instruction. "[I]f Mr. Salisbury actually believed that what he was doing was in accord with the tax statutes," the proposed instruction provided in part, "he cannot be said to have had the criminal intent to willfully evade payment of his taxes." R.124 at 32. We may reverse the district court's refusal to give this instruction only if the instruction is "(1) correct, (2) not substantially covered by the actual jury charge, and (3) so important that failure to give it substantially impairs the defendant's defense." *United States v. Heath*, 525 F.3d 451, 456 (6th Cir. 2008) (citation and quotation marks omitted).

There are two ways of looking at this argument, neither one of which is helpful to Salisbury. To the extent the proposed instruction merely describes the willfulness requirement in more detail, the challenge fails because the district court's actual charge substantially (and accurately) covered the law on willfulness, stating that willfulness requires "the voluntary and intentional violation of a known duty, in other words, acting with the specific intent to avoid paying a tax imposed by the income tax laws, and with the knowledge that there was a legal duty to pay that tax." R.167 at 21; *see United States v. Pomponio*, 429 U.S. 10, 12–13 (1976) (per curiam) ("The trial judge . . . adequately instructed the jury on willfulness. An additional instruction on good faith was unnecessary."); *United States v. Tarwater*, 308 F.3d 494, 510 (6th Cir. 2002).

To the extent the proposed instruction would have added something more to the willfulness requirement, that does not help him either. His proposal also would have added that "Mr. Salisbury would not be 'willfully' doing wrong if . . . he in good faith consulted an attorney or tax preparer whom he considered competent, made a full and accurate report to that person of all material facts . . . and then acted strictly in accordance with the advice given by that person." R.124 at 32–33. The problem with this argument, as the district court noted, is that Salisbury did not lay a foundation for it. *Cf. Tarwater*, 308 F.3d at 510 ("we question whether Tarwater presented any evidence to support his good faith defense"). Salisbury did not testify, so he could not explain what he believed about his taxes or whether he made a full and accurate report to his tax preparer. While his tax preparer did testify, he recalled little about whether he had any contemporaneous communications with Salisbury about gun commissions. Even his attempts to amend his returns after the fact would not show that he made a full and accurate report of all material facts to his tax preparer, and certainly not that he did so *at the time of filing*.

Salisbury leans heavily on *United States v. Morris*, 20 F.3d 1111 (11th Cir. 1994), but the case does not support him. There, yes, the court reversed a conviction for failure to give a "good faith" instruction, but due only to the inadequacy of the instruction the district court gave, not due to a requirement that an additional good faith instruction is required. In truth, the "good faith" instruction the defendant proposed was fairly close to the instruction the court gave here. *Id.* at 1116 ("The government . . . must prove that each of the defendants knew that the law placed a duty on him and that he voluntarily and intentionally violated that duty.").

V.

Salisbury also contests the sufficiency of the evidence against him. He does not dispute the deficiency of the tax payments, just the element of willfulness. The government never proved, he says, that he willfully chose not to report his profits in the years of the transactions as opposed to the years when he cleared out all of his gun inventory.

Salisbury comes close to forfeiting this claim for failing to include a "statement of the facts *relevant to the issue[] submitted for review* with appropriate references to the record," as the Appellate Rules require. Fed. R. App. P. 28(a)(7) (emphasis added). At trial, it is true, a defendant may sit on his hands and refuse to acknowledge the evidence against him. But on appeal, the defendant has lost the presumption of innocence and must explain what evidence existed and why it does not suffice. *See Herrera v. Collins*, 506 U.S. 390, 399 (1993). Salisbury's fact statement describes in great detail the facts relevant to the charges *of which he was acquitted.* But it simply does not deal with the facts relevant to the charges of which he was convicted, save to note without elaboration that he was convicted of failing to pay taxes. That does not comply with the Federal Rules.

The argument, in any event, fails on the merits. Salisbury argued that he could have thought he had to pay taxes only on *cash flow*, not profits that had been plowed back into inventory (that is, guns). Because Salisbury kept accumulating guns during this period, the argument goes, he could have believed he did not have to pay anything until he cashed out.

- 10 -

But the jury had ample bases to reject this argument. For one, Salisbury reported some income for gun sales in 1999 and 2002, which suggests he knew he had to report this income in the years it was earned. For another, the jury fairly could have viewed his accumulation of guns as a personal collection, not inventory, in which case Salisbury would have known he had to report the income he used to buy the guns. That would explain why his gun collection kept growing by the amount it did, which is more in the nature of a personal collection than an inventory.

For still another reason, Salisbury, who indeed kept some of his profits in the form of more weapons, received some of his profits in more liquid form, such as an explicit commission of $150,000 for one transaction that never showed up in his taxes for the relevant year. And he received checks from a painter who sold art to Frazier and the museum, and these went unreported as well. Salisbury's counsel tried to argue he reinvested much of this money in more guns, but the jury was free not to credit this argument. If the jury disbelieved it, failing to report liquid income of this size would create an inference of willfulness. *See United States v. Lavoie*, 433 F.3d 95, 98 (1st Cir. 2005).

For still another reason, the magnitude of Salisbury's underreporting—even by his own expert's analysis, over $800,000 in income and $400,000 in taxes in the two years—supports a willfulness finding. Salisbury argued that his tax preparer told him in late 2002 not to pay taxes on guns for which there was any dispute over title (he and the Museum had been battling over his private collection after he was fired), which could have explained the underreporting. But the jury did not have to draw that inference. And the numbers *before* amendment look worse. The jury was

free to treat his attempts to amend as evidence of his good faith (as he tried to argue), or as evidence that he knew he was in trouble (as the government argued).

For a final reason, other aspects of Salisbury's transactions create an inference of dishonesty. He appears to have lied about the extent of his gun sales during a deposition in his divorce case. He had many of his earnings from the Frazier transactions sent through his girlfriend's account rather than his own, apparently for the purpose of hiding it from his soon-to-be ex-wife. In the final analysis, sufficient evidence supports the jury's willfulness finding.

VI.

Salisbury raises two challenges to his sentence, both unavailing.

A.

He first argues that the relevant sentencing guidelines violate Congress's recommendation against incarceration for first-time, non-violent, non-serious offenders. The guidelines, he notes, used to treat felony tax evasion (§ 7201) differently from misdemeanor failure to pay (§ 7203), until in 1993 the Sentencing Commission deleted former U.S.S.G. § 2T1.2 and consolidated both crimes under § 2T1.1. *See* U.S.S.G. app. C., amend. 491. Under the latter guideline, felony and misdemeanor convictions derive their base offense level from the amount of tax loss, as calculated under the tax table in § 2T4.1. The table recommends prison terms for even first-time offenders when losses exceed $5,000. *See* U.S.S.G. § 2T4.1(C); *id.* Sent'g Table, ch. 5, pt. A.

It is true that the Commission's enabling statute instructs the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first-time offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j). But another part of that section instructs the Commission to "insure that the Guidelines reflect the fact that, in many cases, current sentences do not accurately reflect the seriousness of the offense." 28 U.S.C. § 994(m). And "[o]ne of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes." *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008).

More, the language of the enabling statute, beginning "The Commission shall insure that the guidelines reflect the general appropriateness of . . . ," 28 U.S.C. § 994(j), does not establish an imperative that demands rigorous judicial policing. The Commission enjoys "significant discretion in formulating guidelines," *United States v. LaBonte*, 520 U.S. 751, 757 (1997) (quotation marks omitted), and we cannot say that it exceeded that discretion here. One may debate whether a prison term should kick in at $5,000 or $50,000 dollars, but where the loss is over a million dollars, as here, it is hard to argue the Commission went too far.

## B.

Salisbury also argues that the district court clearly erred when it treated him as a collector rather than a dealer in computing the tax loss. The reason the dealer/collector distinction *could have* mattered is that a dealer can use accrual accounting instead of cash accounting, which allows the

dealer to account for his inventory and the inventory's changing value. And this *could have* meant a lower tax deficiency and thus a lower offense level under the guidelines. But all of this comes to naught because Salisbury would have received the same sentence either way.

The district court considered both the defense's numbers (calculated by Jessee on an inventory basis) and the government's numbers (calculated by IRS agent Jeff Sagrecy on a cash basis) and found that both scenarios gave Salisbury an offense level of 22 and a range of 41 to 51 months. The court, to be sure, rejected Salisbury's proposed *write-downs* on his inventory. But Salisbury does not appeal that ruling, and in any event it would have taken more than an 80% write-down to bring the guidelines range below the statutory maximum. *See* U.S.S.G. § 2T4.1(F), (G); *see also* R.237 at 53 ("[I]t doesn't seem to me that it makes much difference whether we're at 22 or 20. It's still way over the 24 months."); *id.* at 69 ("I don't know that the hump is particularly important here because the maximum he could get would be 24 months.").

VII.

For these reasons, we affirm.